UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE, KENTUCKY


UNITED STATES OF AMERICA,       ) Pikeville Criminal
                                ) Action No. 13-15
        Plaintiff,              )
                                ) At Lexington, Kentucky
-vs-                            )
                                ) April 7, 2014
JOHN TRAVIS MILLNER,            ) 10:50 a.m.
                                )
        Defendant.              )


TRANSCRIPT OF STATUS CONFERENCE HEARING PROCEEDINGS
BEFORE THE HONORABLE AMUL R. THAPAR
UNITED STATES DISTRICT JUDGE


Court Reporter:                 PEGGY W. WEBER, RPR
                                Official Court Reporter
                                U.S. District Court
                                P.O. Box 362
                                Lexington, Kentucky  40588
                                (859) 421-0814


Proceedings recorded by mechanical stenography,
transcript produced by computer.

2

```
 1  Appearances:

 2
    On behalf of Plaintiff:      ROGER WEST, ESQ.
 3                               Assistant U.S. Attorney
                                 260 West Vine Street
 4                               Suite 300
                                 Lexington, Kentucky  40507
 5
    -and-                        BRUCE HEGYI, ESQ.
 6                               AMANDA HAINES, ESQ.
                                 U.S. Department of Justice
 7                               Capital Case Section
                                 1331 F Street NW, Third Floor
 8                               Washington, D.C.  20530

 9  On behalf of Defendant:      PATRICK F. NASH, ESQ.
                                 NASH MARSHALL, PLLC
10                               129 West Short Street
                                 Lexington, Kentucky  40507
11
    -and-                        KEVIN McNALLY, ESQ.
12                               McNally & O'Donnell, PSC
                                 513 Capitol Avenue
13                               P.O. Box 1243
                                 Frankfort, Kentucky  40601
14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Whereupon, the Status Conference Hearing proceedings

2  commenced on Monday, April 7, 2014, at 10:50 a.m., on

3  the record in open court, as follows.)

4            THE COURT:  Please call the case.

5            THE CLERK:  Yes, Your Honor.

6            Pikeville Criminal Action Number 13-15,

7  United States of America versus John Travis Millner,

8  called for status conference.

9            THE COURT:  Counsel, please enter their

10  appearances.

11           MR. WEST:  Yes, Your Honor.  Good morning.

12  Roger West and Bruce Hegyi and Amanda Haines here on

13  behalf of the United States, sir.

14           THE COURT:  Good morning to both of you.

15           MR. NASH:  Good morning, Your Honor.

16  Patrick Nash on behalf of John Millner, along with my

17  co-counsel Kevin McNally.

18           THE COURT:  Good morning.

19           MR. McNALLY:  Good morning, Your Honor.

20           THE COURT:  Counsel, we're here because there's

21  some motions in front of me, as well as we probably set

22  this status conference as far as I can remember.

23           I reviewed the motions, as well as the motion

24  to continue, to which obviously your response has not yet

25  been filed.

 1          I have a -- this is dangerous to think out

 2 loud, but I'm just -- I have a generic question that I

 3 welcome your thoughts on, and then I -- and I'm -- this

 4 is thinking out loud.

 5          Is there any way -- Mr. West, I'll start with

 6 you since I would imagine the defendant would not have

 7 objection to this, but the government might -- to

 8 separate the liability and penalty phase in such a way

 9 that we try the liability phase rather soon, meaning, I

10 don't know, next four months or whatever it takes the

11 defense to be prepared?  We could keep the same jury and

12 alternates, so the alternates would have heard any.  And

13 assuming a conviction, then have a six-month or even

14 12-month gap, where we do all the discovery.  You know, I

15 would run a pretty tight ship at that point.  And we do

16 the penalty phase, and we bring the jury back.  I can

17 even bring them back quarterly to voir dire them and

18 remind them of the importance of not reading anything or

19 anything of that sort.

20          MR. WEST:  Your Honor, I might defer to

21 Mr. Hegyi from the capital crimes unit.  He's more

22 experienced in that type of question, sir.

23          THE COURT:  Okay.

24          MR. HEGYI:  If I -- if I might, Your Honor.

25 It's an interesting thought, but the -- I don't know of

1  anywhere where it's ever been done that way.  There

2  are -- to be sure, there are times -- in fact, my

3  co-counsel Ms. Haines has one of these right now, where

4  an individual may be sentenced to death, go through the

5  whole process, goes up on appeal, and then the -- the

6  death part is reversed.  So the liability is found, and

7  now all we have to do is the death verdict again.

8           THE COURT:  And do you get a new jury for that?

9           MR. HEGYI:  There is a new jury that's obtained

10 for that because obviously no one anticipates years later

11 having an appeal, and the appeal being -- and the appeal

12 being successful on the guilt phase.

13          So a new jury is impaneled, and then under

14 those circumstances then the government ends up getting

15 leeway to put on, if I may, through the mad facts, some

16 of the mad facts of the trial, because otherwise the jury

17 would be -- would be insulated and get a sanitized

18 version, and then would simply be getting a -- an

19 unrealistic view of that -- of that individual, his

20 background, and what he's done and what he's capable of

21 doing.  The --

22          THE COURT:  But the background and what he's

23 capable of doing are all, at least as you've listed them,

24 potentially aggravating factors; right?

25          MR. HEGYI:  They would be, Your Honor.  And --

1        THE COURT:  So it would just be the context of

2   the crime.  And so my suggestion is what if we impaneled

3   the jury of 18, 12 of them would obviously render

4   verdict.  Now, you have to assume a guilt verdict or it's

5   over anyway.

6        MR. HEGYI:  Yes, sir.

7        THE COURT:  And then -- and it seems to me that

8   could preserve resources.  Although, I would tell the

9   defense to prepare as if the whole thing -- I mean, in

10  some sense don't -- if we had a gap, it's essentially the

11  defense timeline with the liability kind of up front.  It

12  seems to alleviate a lot of the concerns you have.  I'm

13  just -- we have the same jury.  I understand you'd

14  probably want to refresh their recollection a year later,

15  and you'd have the same six alternates because they would

16  have heard all the evidence.  And it didn't -- it

17  wouldn't seem to me to be -- unless you all thought or

18  the defense thought -- a constitutional issue.  I can't

19  think of one, if an alternate doesn't decide the guilt

20  phase but does the penalty phase.  And the reason I can't

21  is for the exact reason you've given, that we have

22  different juries decide the penalty phase all the time.

23       MR. HEGYI:  We do.  And there are -- there are

24  cases where for one reason or another a juror on the

25  guilt phase has become incompetent, for whatever reason

1    to go forward, and an alternate is substituted at the

2    penalty phase.

3           The concern though -- I mean, I've never --

4    I've never had this.  It's a novel approach.  But my real

5    concern is the practical one where the -- what tends to

6    happen, if I may, Your Honor, is if -- if a death verdict

7    comes down on the appeals, as appeals are pending, the

8    defense tends to go and actually like try to interview

9    every one of the jurors.  They go to their -- they go to

10   their work, they go to their neighbors, they try to find

11   out anybody that they've spoken to, may have spoken to

12   about it, and they use those as a means to try to

13   overcome the death verdict.

14          THE COURT:  But they wouldn't.  I mean, I

15   can -- I'm sure Mr. Nash and Mr. McNally would have no

16   problem agreeing not to tamper with the jury.  In fact,

17   they'd go to jail if they tampered with the jury in

18   the -- while the trial was ongoing.  And this would be

19   ongoing; right?

20          MR. HEGYI:  Yes, sir.

21          THE COURT:  We essentially recess the trial --

22          MR. HEGYI:  Yes, sir.

23          THE COURT:  -- for a portion.

24          MR. HEGYI:  And it's just that we would -- we

25   would all be in a posture where if one of the jurors,

1    though instructed to come forward if their child or

2    their, you know, a relative or somebody at work came

3    to them, if they would -- we would be relying on them

4    100 percent for the six-month period that they

5    wouldn't -- they wouldn't go and -- they wouldn't be

6    speaking to anybody.  If anything ever came up in the

7    media, they wouldn't look at it.  If somebody forwarded

8    them something --

9                THE COURT:  No, I understand that, but what if

10   I had quarterly status conferences with the jury where I

11   just voir dired them?  Because they're going to answer.

12   I'll tell you, it's different volunteering information

13   than directly answering the Judge's question.  And we

14   could agree to the questions ahead of time.  The defense

15   is going to have the same interest the government has in

16   making sure the jury isn't tampered with.  And I think if

17   instructed and then repeatedly instructed, even every

18   three months, and voir dired, I just think once you do it

19   once, you're not going to have any issues.

20               MR. HEGYI:  And particularly if we had a larger

21   group of alternates, if I understand Your Honor.  It's

22   something that we've never -- I've never -- it's never

23   come up to my knowledge.  And if I -- if possible, and I

24   left my phone, of course, down with the -- with the front

25   desk.  I would -- I would ask if we could take a break at

1    some point and let me -- let me call back and see.  I --

2              THE COURT:  Well, I'm not going to ask you

3    to -- you nor the defense to answer this question today

4    because I'm springing it on you.

5              I think my thought was I'm trying to alleviate

6    the concerns raised in your motions and think of a way --

7    and I just -- it's always dangerous to be novel in death

8    penalty cases.  I mean, everyone just wants to check the

9    box so that, you know, it's like a box-checking exercise.

10   Is this a problem?  No.  Is this a problem?  Could be,

11   okay, avoid it.

12             And I think federal courts more so, we're less

13   daring just by nature than state courts who are willing

14   to -- I think most death penalty jurisprudence is created

15   through the state courts because they're willing to go

16   outside the box.

17             So I'm not trying to create any issues, and I

18   would never ask you to answer it on the fly.  I just

19   wanted your initial gut reaction.  And I'd want you and

20   the defense to have time to reflect on the idea before

21   forcing you to answer.  I mean, I will at some point

22   force you to answer.

23             MR. HEGYI:  Sure.  And it makes -- and, I mean,

24   what you're saying has a certain intuitive appeal with

25   regard to the firewall issue.

```
 1              THE COURT:  Right.

 2              MR. HEGYI:  With regard to the front-end

 3  loading we would still need to go through the fairly

 4  tedious process of getting a death-qualified jury, but we

 5  would have to do that one way or the other.  Okay.

 6              THE COURT:  Yeah -- no, I agree with that.  We

 7  would have to do that one way or the other.

 8              One other -- let me -- and maybe you're better

 9  qualified, maybe Mr. West is, but it seems -- on this

10  question.  It seems to me on the liability phase this is

11  not a complex trial.  I mean, obviously, for speedy trial

12  purposes, I'm not use -- I'm using the wrong language

13  because I don't want to send the message that, of course,

14  the entire case is complex, and there's so much at stake

15  that I think even Congress would agree we're excepted

16  from the Speedy Trial Act.  Before the purposes of

17  presenting the facts in the liability phase, I don't see

18  this as complex as I do potentially the penalty phase.

19              MR. HEGYI:  And Your Honor would be correct in

20  that, in that essentially -- and defense has this.

21  There's a video.  There's -- there are people are going

22  into a cell for count.  Two people go into a cell, cell

23  door close, cell doors never open.  When they go to end

24  the count, one person in the cell is alive, one person is

25  dead.  Mr. Millner is walking around with the knife in
```

1    his hand saying, you need to get him out of here.

2              So there may be some -- there have been some

3    suggestions from the defense that there might be some

4    self-defense component to this.  But it is -- for that

5    extent it's not overly complicated.  And I -- so I agree

6    with what Your Honor is saying.

7              THE COURT:  Okay.

8              MR. HEGYI:  It would not -- it would not be an

9    immensely complicated, nor time-consuming trial, on the

10   liability phase alone.  I don't want me to speak for the

11   defense on that though, Your Honor.

12             THE COURT:  Okay.  Thank you.

13             All right.  Mr. Nash, you've heard -- or

14   Mr. McNally.  You've heard everything I kind of sprung.

15   I know this is -- part comes out of a suggestion in your

16   brief, although, I don't know that you contemplated this

17   long of a gap.  The only reason I'm proposing this long

18   of a gap is a lot of what Mr. McNally said last time --

19   this is not in your brief.  But I think what he said last

20   time is the primary -- a lot of the work needs to be done

21   on the aggravators.  In other words, he brought up the

22   quantity of aggravators.  I think it was him and not you,

23   but I can't recall.

24             MR. NASH:  Well, we're of a mind that, so it

25   could be have been either one of us.

12

1          Certainly -- well, let me start with that last

2   point first and then work backwards to the idea of this

3   sort of bifurcation.

4          Certainly when you just look at the sheer

5   quantity of allegation and what the defense is going to

6   have to do to prepare defense, there are -- there's

7   vastly more in the aggravator side than there is in the

8   guilt/innocent side.

9          But I don't want -- I don't want the idea to be

10  out there that this is a simple case even on the charged

11  conduct.

12         And here's why.  I understand the government's

13  position.  And if I were in their shoes, I would

14  characterize it as a simple case also.  Two guys go in,

15  one guy comes out, simple case, end of story.

16         But it's far from simple as we have discovered

17  in the limited amount of investigation that we've been

18  able to do.  There were literally hundreds of prisoners

19  in this range.  A good number of them were from

20  Washington, D.C.  And as Your Honor is well aware, in the

21  prison setting that means something.  Geographical

22  locations mean something to these prisoners.  They form

23  affiliations and groups, and then there's a group

24  dynamic, and things are done or are not done as a result

25  oftentimes of very complicated interpersonal conflicts,

13

1  interactions, and things like that.

2          We have been -- we have started to try to get

3  to the bottom of that.  And I'm now -- I'm just now I'm

4  talking about the charge conduct now, not any of these

5  aggravators.

6          And so what that means is, is we have -- and we

7  have already done some of this.  We have to interview a

8  good number of those witnesses, especially the ones from

9  D.C.  Like both my client and Mr. Smith were both from

10 D.C.  We have to interview a good number of those people

11 because motive and what happened and who did what to whom

12 first and why are extremely important in this case.

13 And that's going to be the case in regards to the

14 guilt/innocence phase.

15          THE COURT:  You agree though that, I guess, the

16 way -- still this is something you were obviously as --

17 maybe as qualified as anyone in America to speak to, but

18 it's not that it's complex, it's that it's discovery from

19 your perspective intensive.

20          MR. NASH:  It's investigative intensive.

21          THE COURT:  Okay.

22          MR. NASH:  Discovery intensive.  And I guess it

23 depends on how you define complex.  I mean, understanding

24 the relationships and the hierarchy and who does what,

25 why, and when, I mean, that's --

```
1                    THE COURT:  No, I agree.

2                    MR. NASH:  -- one level factually that's

3    complex.

4                    THE COURT:  I think it's factually maybe more

5    complex, but it seems to me a lot of the challenges in

6    the -- a lot of what we focused on so far are the

7    challenges related to the penalty phase.

8                    MR. NASH:  Right.

9                    THE COURT:  Okay.

10                   MR. NASH:  Okay.  So that's that point.

11                   So now backing up to Your Honor's idea of this

12   bifurcation.  I would say I share Mr. Hegyi's initial

13   misgivings about that.  And I agree with what he said in

14   the first instance.  I have been involved in a state

15   level capital case that came back for resentencing only.

16   And I've been involved in the process of trying to figure

17   out how do you educate a brand new juror or a cold jury.

18   Now, this won't be a brand new jury in your mind -- in

19   your model, but it will certainly be a cold -- a jury

20   that's been away from the case for a number of months,

21   maybe 12 months or more.

22                   And so there's going to be some re-education

23   involved on both sides, and that -- in the case that I

24   had in state court, that was a real challenge on figuring

25   out the parameters of that, how far each side was allowed
```

15

1   to go, were we just reading from the cold transcript?  If

2   so, what parts would we read from, what parts would we

3   leave out?  Should we read the whole thing?  Should it

4   be --

5          THE COURT:  But that's -- that's different;

6   right, because you have a brand new jury?

7          MR. NASH:  Well, that was a brand new jury.

8   But some of that certainly is going to arise here.

9   There's going to be some refreshing that's going to need

10   to be had, and I anticipate that both sides are going to

11   want to refresh on different parts.  And so there's going

12   to be some complexity of that and some duplication of

13   that.  So that's my first misgiving.

14          Secondly, I -- I agree with Mr. Hegyi.  Again,

15   even if Your Honor is bringing these juries in every

16   three months to admonish them, I mean, we've still got

17   human beings that are out there in the community for

18   months and months and months, and the potential for just

19   something to happen to a juror here and there increases

20   as time goes by.  I think it's just a natural thing.

21          THE COURT:  No, I think that's right.  That

22   would be my number one concern.

23          And let me -- let me ask you though, right,

24   because it's -- it's interesting because -- and I'm -- I

25   perfectly respect your misgivings.  I think at the same

1  time you are in your brief at least indicating a proposal

2  of a gap in time.

3          The other solution is the taint team that the

4  government rightfully points out, Courts have routinely

5  approved.

6          MR. NASH:  Right.  And I'm going to let

7  Mr. McNally speak to that part of it.  May I make one

8  final point?

9          THE COURT:  Absolutely.

10          MR. NASH:  The -- and we are trained as defense

11  attorneys, and I presume probably the United States is

12  too, in a case like this where you're putting on the

13  guilt/innocence defense, we are trained to try to

14  obviously anticipate what would happen in the penalty

15  phase and to weave some of that into the guilt/innocence

16  part.  We call it front loading on the defense side.

17  Maybe they call it that too.  I don't know.  But we are

18  trained to do that and to try to really, as we make our

19  presentation to the jury, have the whole picture in mind

20  so that where it's proper and appropriate we can front

21  load into the guilt/innocence part, relevant parts, that

22  are going to come up in the -- potentially come up in the

23  penalty phase.  And that's -- and that's what we're

24  supposed to do.

25          In Your -- in Your Honor's model, although we

1    will certainly have an idea of what we're going to be

2    doing in the penalty phase, we still would not have fully

3    developed it yet because the way Your Honor --

4              THE COURT:  Well, your -- your motion asks to

5    preclude the government from developing it with regards

6    to the interview of the defendant.  In other words,

7    you're asking yourself -- I mean, this all comes, and you

8    may be right, I mean, it's just an idea, and it's

9    probably a bad one from what I'm hearing, but it all

10   comes from the suggestion in your very motion, or

11   response, that we have a gap.

12             MR. NASH:  Well, and if -- if I could, I'm

13   going to defer to Mr. McNally on that.  But just want to

14   leave that one point about the idea that if we do have a

15   gap, we're going to have -- our ability to properly front

16   load some evidence is probably going to be diminished is

17   my concern.  And that's just on the defense side.  I'm

18   not talking about what the prosecution is going to do or

19   should be able to do.

20             THE COURT:  Okay.

21             MR. McNALLY:  Yes.  We made the suggestion that

22   one alternative for you is to have a gap.  Mr. Hegyi

23   spoke in terms of six to eight weeks in his initial

24   motion, and then eight to ten weeks -- eight to ten weeks

25   in his reply.  We don't think it would need to be that

18

1   long.  And there is some precedence for those kind of

2   gaps, smaller gaps than six months or 12 months.

3          We find fascinating the idea of thinking

4   outside the box, and it's creative, but I share

5   co-counsel's and opposing counsel's concern about that

6   much of a gap.

7          THE COURT:  Okay.  Well, I mean, that answers

8   my question.  I just -- I won't do it without your-all's

9   approval.  I think -- but I would be more inclined -- I

10  was not -- I would be more inclined to let the government

11  establish a taint team in that situation; right?  I mean,

12  I think it's unfair to say, look, you get four weeks, and

13  you're asking for two years, and at the same time you're

14  turning around and telling the government, oh, you can do

15  all your stuff in four weeks.  And it seems to me the

16  better process is to have a taint team.  And I understand

17  your concerns.

18         But as the government points out in their reply

19  brief, or maybe in their initial brief, you can get a

20  team from another district and not have them involved and

21  let them do the work.  And then at some point they --

22  whenever the guilt/innocence is determined, they turn it

23  over to the prosecution team.

24         MR. McNALLY:  We strongly object to a taint

25  team, and it's only been done once, and that was last

19

```
 1  week over the objection of the defense so --
 2            THE COURT:  What do you mean it's -- I'm sorry.
 3  It's only been done once?
 4            MR. McNALLY:  Over the objection of the defense
 5  has a taint team been appointed.  And I believe Mr. Hegyi
 6  will concede this.  It's always been done either on --
 7  this started out, Judge, as a defense idea.  And I'll
 8  admit my project bears some responsibility for it.  It
 9  was like sort of a creative way around immediate
10  disclosure of confidential information by the defense.
11  As time went on, though, it didn't work out.
12            THE COURT:  Why?
13            MR. McNALLY:  Well, for one thing, all it does
14  is create a one-way discovery then, which is why the
15  capital case unit wants this so badly, where the defense
16  gives everything to government attorneys, albeit, not the
17  ones here.
18            And then what happens is more prosecutors end
19  up joining the penalty phase team once the decisions have
20  been made about what evidence is going to be presented by
21  either side, and we're -- we end up in a disadvantage.
22            THE COURT:  Because they have more prosecutors?
23            MR. McNALLY:  More prosecutors, one-way
24  discovery early and --
25            THE COURT:  Well, but the one-way discovery is
```

1    like if I set up an independent team of lawyers, it's

2    just another group of lawyers.

3         Now, whether they can add them or not, I mean,

4    I actually think more prosecutors is an advantage for

5    you, not a disadvantage.  I mean, I've always believed

6    less is more when trying -- now, I mean, that's my

7    experience.  I mean, Mr. Nash loves coming to the table

8    and just him and the defendant and a group of lawyers

9    over there.  He uses that to his advantage all the time.

10   I think most good defense attorneys do.  It's look at us

11   and look at the big bad government.  And you bring in

12   more lawyers, I mean, you can definitely paint that

13   picture.  I mean, look at all these people on the

14   government side, and here we are two lawyers and a client

15   trying to fight off the United States of America.

16        MR. McNALLY:  There also have been a couple of

17   instances where there have been violations of the

18   firewall, and I didn't put those in our response.  I

19   should have.

20        THE COURT:  Well, but I would -- I mean, that

21   would be it.  If there was a violation of the firewall,

22   that would be the end of the death penalty as far as I'm

23   concerned, and then the government can take it up on

24   appeal.  But they're not going to violate the firewall.

25   I have every confidence they won't.  And if they do, I

21

1   mean, the sanctions could be very severe.

2          MR. McNALLY:  I appreciate that.  Thank you,

3   Your Honor.

4          But, again, until in the Montgomery case last

5   week, no Judge had ever --

6          THE COURT:  Can you tell me a little bit about

7   the Montgomery case?  I'm sorry.

8          MR. McNALLY:  I don't know that much about it.

9   Mr. Hegyi apparently has been involved in it.  It's a --

10  it's a --

11          THE COURT:  Where is the case?

12          MR. McNALLY:  It's Memphis.

13          THE COURT:  Who's the judge?

14          MR. McNALLY:  Is it McCalla?

15          MR. HEGYI:  Give me one second, Your Honor.  I

16  attached a copy of the memorandum opinion.

17          MR. McNALLY:  Oh, yeah.

18          MR. HEGYI:  It is McCalla.

19          THE COURT:  Which is that?

20          MR. HEGYI:  It will be Exhibit E to the

21  government's reply.  It is McCalla.  And also in the

22  Lujan case in the District of New Mexico, which attached

23  as Exhibit F, is another case where the judge, over

24  defense objection, installed a firewall counsel.

25          MR. McNALLY:  So just -- but other than, I

22

1  think one case, he says two, I'll have to check on that.

2  Other than those two cases it's been on defense motion or

3  where the defense agrees to it.  And so we're going down

4  a different path here, and it's never been tested out on

5  appeal that I know of, so we --

6          THE COURT:  You mean where the defense has

7  objected?

8          MR. McNALLY:  Yes.  And we are objecting.

9          THE COURT:  Well, I understand that.

10         What would happen -- in your mind how would the

11  process work?  Give me -- give me how it would work.

12         MR. McNALLY:  In our mind we would have a trial

13  at a certain date, a liability trial, and there would be

14  a hiatus of -- I would think four weeks would be plenty

15  of time to do a -- even if necessary.  If not necessary,

16  then you go right into the penalty phase.  But if it's

17  necessary, that government evaluators need to talk to

18  Mr. Millner.  And, frankly, I'm skeptical of that, if we

19  would ever waive our Fifth Amendment right here but who

20  knows.  But if they need to --

21         THE COURT:  Wait, wait, I'm sorry.  You would

22  ever waive your Fifth Amendment right.  You mean

23  post-guilt you wouldn't allow them to talk to him?

24         MR. McNALLY:  Possibly.  I don't -- we can't

25  say at this point.  That's possible if we decided that

1  that's not the path we want to go.

2         THE COURT:  Oh, if it's not -- okay.  If it's

3  not the path you want to go, but you agree if it is the

4  path you pursue, then Cheever and the cases that the

5  government cites controls that.

6         MR. McNALLY:  I agree that if we call mental

7  health experts who have interviewed Mr. Millner, the

8  defendant, and are basing their testimony on an interview

9  of Mr. Millner, then they have a reciprocal right under

10  existing case law to do the same.

11         THE COURT:  Okay.

12         MR. HEGYI:  Your Honor, if I could, I just want

13  to make sure we're not -- we're not passing here.

14  Because, with all due respect, we may -- we want to make

15  sure we're clear on the record here.  Because if the

16  defense counsel -- what he just said would leave him open

17  to do precisely this.  He would have a group of experts

18  that would interview Mr. Millner.  They would then feed

19  their reports to some other expert, and that expert would

20  testify.  In which case he would now say, he could now

21  stand in front of you and say, well, Your Honor, I never

22  said we wouldn't do that.

23         And I think that under -- I think under Cheever

24  if they're going to put his mental health in issue and

25  anybody has interviewed him and any defense expert is

24

1  going to rely on that, I think under a fair reading of

2  the Cheever case we should have a right to have our

3  people as well.

4          THE COURT:  And I think that's right.  But he's

5  not saying what you're -- you're speculating.

6          MR. HEGYI:  I am.  I am, Your Honor because --

7  I am, and I grant you that I am.  I'm just highlighting

8  that for the Court at this point because it seemed that

9  counsel was choosing his words very carefully.  And I

10 want to make -- so I wanted to flush this out sort of

11 right now.

12          The other issue, if I may, Your Honor, that I

13 want to make sure that -- because Your Honor is going

14 through this very methodically, is the whole concept of

15 Atkins.  And if we're going to do Atkins, we're not going

16 to do Atkins, then that would be, I would urge

17 Your Honor, there is an essence, a universe of cases with

18 the one exception that they found in the Eastern District

19 of Virginia in 2005, which we can't find.  It's been

20 followed -- in fact, it wasn't followed just last year in

21 the Eastern District of Virginia where Atkins went to the

22 jury.

23          Every other case that I know of that's a

24 federal case, it's been presented, it's done by the

25 judge, and it's done pretrial.

25

```
 1              And the emails that we attached and I think
 2  their filings and our filings would indicate to
 3  Your Honor that there is at least -- there is at least an
 4  effort by the defense to keep that as an open issue, like
 5  when they would raise that, and who ought to decide that,
 6  should that be a jury or should that be --
 7              THE COURT:  Well, they didn't ask that a jury
 8  decide it.  They just indicated that it had been done.
 9              MR. HEGYI:  Yes, Your Honor.  And then they
10  carefully indicated in their response that they had not
11  made a decision pretrial of that -- that pretrial they
12  didn't think that they would be raising it.  And they
13  shoehorned that phrase in pretrial, which -- which is a
14  pregnant phrase suggesting that they're not saying what
15  they're going to do after the pretrial phase, and they
16  might try to raise it in the gap between the guilt phase
17  and the penalty phase, and then come in and ask
18  Your Honor to make the decision about mental retardation
19  before the beginning of the penalty phase, or else try it
20  before the jury.
21              THE COURT:  Well, I mean, I'll tell you, if
22  we're doing -- if we're doing a year gap, I would
23  probably be inclined to let them do that.  With a
24  four-week gap as they're proposing, I would never be
25  inclined to let them do that.  They would have to
```

26

1    indicate -- I mean, they can't have their cake and eat it

2    too, just like you can't.  I mean, at some point they've

3    got to agree to a workable process.

4           And I guess I don't have -- let me ask you

5    this.  Would the taint team -- to put this back on you.

6           MR. HEGYI:  Yes, Your Honor.

7           THE COURT:  Would you have as much concern?  I

8    mean, then you're not getting surprised in the way you're

9    talking about.

10          MR. HEGYI:  Correct.  If we have a taint team

11   in place, then the government's -- the government's level

12   of concern is reduced dramatically, because counsel

13   indicating like four weeks.  And I have to -- if I may,

14   Your Honor, if we think this through.  We don't know what

15   they're going to say.  And we -- some of these cases

16   where they've alleged mental retardation, they go with

17   what are called PET scans.  They're like MRIs of the

18   brain.  Others they don't.  Sometimes they bring in

19   psychiatrists.  Sometimes they bring in psychologists.

20          I attached the opinion from the Chastain

21   Montgomery case so Your Honor could see how in that case

22   the Court actually heard testimony from, I think, over

23   20 what are called percipient witnesses in that case, and

24   it was very important in informing the judge of whether

25   the defendant had met his burden.

27

1           And so for the defense to suddenly spring up

2   and say, you know, well, four weeks is plenty, well, we

3   haven't -- if they're not raising it, why are we -- how

4   are we -- what are we investigating?  There's nothing for

5   us really to investigate yet.

6           And if they jump up -- and then you'll see in

7   the Chastain Montgomery's and other cases where they come

8   up with five experts, six experts.  You know, most times

9   judges cut that off, and you get one or two.  But if they

10  come up with -- and, again, we have no way of knowing

11  this generally.  And -- but if they come up with that

12  many, we don't necessarily know what -- what experts to

13  respond with, what specialties.

14          THE COURT:  No, I understand that.

15          MR. HEGYI:  Okay.

16          THE COURT:  Can I ask you a different question?

17          MR. HEGYI:  Sure.

18          THE COURT:  Which is if you had a taint team,

19  you agree at that point four weeks is sufficient?

20          MR. HEGYI:  Yes.  Well, if the taint team is --

21  if the taint team can get started, I think a four-week

22  gap would be sufficient.  In fact, I think that would --

23  we wouldn't even need a four-week gap.  If the taint team

24  is put in place, and it's put in place, for instance, as

25  the judge did in the Northern District of Oklahoma just

1    last month, and it's done and defense counsel there

2    agreed, a very experienced defense counsel agreed, he

3    would give over to a taint team the mental health stuff.

4    Eight to nine months before the trial was to begin, he

5    would give it over.  They can then work stuff out.  If

6    there are issues, it would go under seal to Your Honor.

7    The government counsel would have no -- we wouldn't have

8    any role.  The trial team would have no role in that, and

9    it would go forward in that manner.

10          The government would then be making its

11   disclosures to the defense as well.  And then at the

12   time, if assuming we get to the guilt phase, and there is

13   a death-eligible verdict in the guilt phase, and we

14   switch to the penalty phase, either we could move right

15   into that and understand penalty phases usually only last

16   a week or less.  They're usually not that drawn out,

17   under ordinary circumstances.  Then we could go

18   immediately to that, invite the taint counsel to come to

19   counsel table and be prepared to cross-examine their

20   witnesses and to put on the government's mental health

21   persons.  Or we could have a week-long gap perhaps, and

22   that might give the government's trial attorneys an

23   opportunity to get up to speed on what the taint counsel

24   has already put in place.  We would have that

25   alternative.

1          Did that answer Your Honor's question?

2          THE COURT:  That does.  That did.

3          Can I ask you one other question?

4          MR. HEGYI:  Of course, Your Honor.

5          THE COURT:  You've -- so in your motion, you've

6  moved to preclude the defense from raising the Atkins

7  defense.

8          MR. HEGYI:  Right.

9          THE COURT:  And I'm hesitant to do that because

10 I think it's a little unfair at this stage of the

11 proceedings.  I recognize what you said.  Look, they've

12 had four years.  They were appointed in 2009.

13          The reality is I think it's a little unfair to

14 dive into what they did during that period.  It's just a

15 process, which the Court wasn't involved in to know

16 enough.  It would be one thing if they had two years in

17 front of me.  It's another thing four years where I'm not

18 even involved for the Court to past judgment on the

19 timeliness.  I think they've indicated at this time, and

20 I think they carefully used those words as you indicated

21 in your reply and maybe in your motion.  I'm sorry I

22 can't distinguish the briefs at this point.

23          But I wouldn't be inclined to preclude them --

24 the process of appointing a taint team and getting

25 involved in that would give -- it seems to me would

1   prejudice the government less than if I precluded them,

2   which would prejudice them more.  I don't know if that

3   makes sense, but I think the balancing of the equity, so

4   to speak.

5           MR. HEGYI:  It would depend on if they were

6   really going to bring an Atkins claim or it was going to

7   be an Atkins -- what I might call an Atkins-like claim.

8   In other words, he's not mentally retarded.  Ladies and

9   gentlemen of the jury, we're not claiming he's mentally

10  retarded, but we're claiming that he is low functioning.

11  And, therefore, you know, in the scheme of things you

12  shouldn't hold him quite as morally responsible as you

13  might someone who had an I.Q. of 110 or 120.  And,

14  therefore, take that into consideration essentially as a

15  mitigator and don't -- don't come back with a death

16  verdict.

17          And if they were going to do that, not -- not

18  ask for an exemption from the death penalty because he's

19  mentally retarded, it would still involve a lot of the

20  same things, a lot of the same testing, a lot of the same

21  experts.  But, again, taint counsel could handle that if

22  that's -- if that's where we're going to go.  And if need

23  be and they were going to have percipient witnesses,

24  which seems to be something that can take a fair amount

25  of time, that, you know, maybe we wouldn't -- there

1  wouldn't be a need for percipient witnesses at that stage

2  because they wouldn't be trying to preclude it.  They

3  would simply be saying, you know, I'm doctor so-and-so,

4  and I've tested him, and, you know, let me tell you what

5  the test scores were.

6          So I think it would be -- it would be still

7  very helpful to have a taint or firewall counsel, and it

8  would make the whole process go more smoothly.

9          THE COURT:  Okay.  All right.  Mr. Nash or

10  Mr. McNally, anything else?

11         MR. McNALLY:  Well, I mean, just -- our

12  credibility with you is important.  And references to

13  scenarios that might occur or occurred in other cases in

14  Mr. Hegyi's mind, can be misleading.  I mean, the jury

15  tampering comment, or the fact that we would take an --

16         THE COURT:  The jury tampering comment I

17  disregarded as I -- I mean --

18         MR. McNALLY:  Or the whole idea.

19         THE COURT:  But you -- I mean, wait a minute.

20  You also -- don't -- I mean, this isn't a one-way street.

21  That's a little unfair because you implied that

22  government counsel were going to breach the firewall.

23  So, I mean, that goes both ways.  He's -- you're

24  speculating, and he's speculating.  I get it.

25         MR. McNALLY:  Okay.

1              THE COURT:  I mean, I'm not an idiot sitting up

2    here.  I may not be that intelligent, but I get the

3    general gist of, you know, you-all are not impugning each

4    other's integrity.  You're just saying, look, this has

5    happened in certain cases; and, Judge, you've never tried

6    a death penalty case.  Maybe you should understand the

7    risks before you assess.

8              It's like my idea.  I throw out let's have a

9    year gap, and Mr. Nash rightfully comes up with a number

10   of risks.  I don't view that as saying I'm incapable.

11   He's just saying, look, Judge, these are things you may

12   not have thought of in the process.  That's all he's

13   saying.  It's all you're saying.

14             I'm not viewing it as impugning each other's

15   integrity or saying, look, they're just trying to set up

16   this taint team so they can break the firewall.  I mean,

17   you're just saying, look, that's a risk, and so I can

18   address that risk.

19             Their risk of jury tampering, I can address

20   that risk.  I mean, these are things I can address, even

21   though I don't expect either side to do them.

22             MR. McNALLY:  Yeah.  My only point was going to

23   be that we weren't going to have somebody interview him

24   and then pass it to some other expert.  I mean, that was

25   one of the scenarios.  That's all.

33

1                    THE COURT:  Okay.  Well, you've put that to

2      rest.

3                    MR. HEGYI:  And, Your Honor, while we're

4      putting things to rest, just very quickly because I know

5      your time is precious.  But I was not suggesting they

6      would send somebody out.  I meant after the fact when

7      people have been sentenced to death, what -- what

8      appellate counsel seems to do is go and try to interview

9      the jurors.  Not that they're doing anything wrong.  But

10     the sentence is already done.  But they try to find

11     instances where the juror may have had a conversation,

12     didn't tell it to the Court, and then --

13                    THE COURT:  Oh, I see.

14                    MR. HEGYI:  -- and then on appeal use that as a

15     basis to overturn it.

16                    THE COURT:  So you're saying that's the danger

17     of the gap?

18                    MR. HEGYI:  Yes, it is.

19                    THE COURT:  Okay.

20                    MR. HEGYI:  And honestly, Your Honor, there was

21     no intent whatsoever to indicate I thought they would do

22     anything like that in the gap at all.

23                    THE COURT:  Okay.

24                    MR. McNALLY:  Your Honor, if I could, one

25     thing on another topic just to correct the record

34

1  because we didn't get to reply to their reply that

2  this -- Dr. Cunningham has never met the client, nor has

3  he ever been to USP McCreary.  That was in their reply.

4          THE COURT:  The list of the two doctors, I

5  can't remember their names.

6          MR. McNALLY:  Right.

7          THE COURT:  All right.  Let me just walk

8  through and just quickly what I think is in front of me.

9          First is the motion in limine to preclude him

10  from adopting an Atkins defense or raising the matter of

11  his mental condition.  I think I addressed that, and I

12  will deny that without prejudice to it being raised

13  later.  But I think right now it is a little premature.

14          The second is a pretrial decision on the Atkins

15  issue, and I guess, Mr. Nash or Mr. McNally, do you -- I

16  didn't understand you to be fully taking objection with

17  that.  You just didn't want it done now.  Is that

18  correct?

19          MR. McNALLY:  If I understand the Court, yes,

20  Your Honor.

21          THE COURT:  In other words, all you're saying

22  is, look, we could raise this at a later date, Judge,

23  just give us -- we're not saying we're going to raise it,

24  but if information comes to us that necessitates us

25  raising it on our client's behalf, of course you can

1  decide it pretrial at some point, but don't do it today.

2  Is that fair, or am I missing --

3           MR. McNALLY:  We exercise our best judgment on

4  January 27th that we're not raising a pretrial Atkins

5  claim, and that situation hasn't changed as of today.

6  But we're lawyers, so we don't know what's going to

7  happen.

8           THE COURT:  Right.  So here's what I would say,

9  and you-all tell me if I'm wrong, anyone that wants to.

10  You don't have to speak at all.

11           It seems to me premature for me to even

12  determine the timing of any Atkins hearing without the

13  defense raising it.  And while you've indicated you

14  wouldn't raise it, I'm willing to leave open the idea

15  that if you discover information later on that leads you

16  to believe you have to raise it to protect your client's

17  interest, that you will notify the Court immediately.

18           And at some point I'm going to set a deadline,

19  but I'm not doing it today.  In other words, at some

20  point I'm going to set a drop-dead deadline which says,

21  look, unless you come into something that just couldn't

22  have been speculated about, that's it, the deadline is

23  set.

24           Is that fair?

25           MR. McNALLY:  Yes, Your Honor.

36

```
 1              THE COURT:  Okay.  I'd like the government to
 2    respond -- and I know you haven't had time to -- to the
 3    motion to set a new schedule.  I'm not against setting a
 4    new schedule, but I think it's a fair point that if we
 5    are to set a pretty -- a schedule, we should set somewhat
 6    of a more comprehensive schedule than we set before,
 7    which I don't know where you raised, but I know -- maybe
 8    I'm combining your motion and their motion because you
 9    asked for certain deadlines in your motion, and they've
10    asked for time periods in theirs.
11              Let me give you-all a suggestion on that, which
12    is I don't know how willing you're -- you are to do this.
13    But we do this in civil cases, and I hate to ever bring
14    anything civil into criminal context just because the
15    criminal context always works better I think.  But that
16    is that a meet and confer where you-all meet and see if
17    you-all can work out the schedule.
18              And I'll tell you, if you-all work out a
19    schedule, I'm going to defer to you.  I think the lawyers
20    in this case are excellent, and I know I've had a lot of
21    experience with Mr. West and Mr. Nash, and I couldn't
22    imagine two better lawyers to be doing this from the
23    Court's perspective in the way they prepare and the fact
24    that I've never found them to waste time.
25              In other words, so if you-all can agree, then
```

1   I'm going to defer to you.  If you can't, what I would

2   like -- and maybe what I'll do is this, and you tell me

3   if you have any objection to this, Mr. Nash.  Is that

4   I'll deny without prejudice your motion to continue, have

5   you-all meet and confer and prepare one document, if it

6   isn't too cumbersome, on dates you agree with and then

7   dates you want the Court to decide.

8              MR. NASH:  I think that would be fine, Judge.

9              THE COURT:  All right.  Then the last thing is

10  that I'd like to take under advisement and is the taint

11  team idea.  And I'm sorry to do this.  I would love to

12  give you a ruling today.  I just want to think about it

13  and reflect on it a little more.

14             I can tell that you as an initial matter, I

15  think it's a good idea as long as it's strongly policed

16  by the Court, and I have no problem doing that.  And I

17  understand, look, problems have happened in every kind of

18  case imaginable, but I think we can put in place

19  protections to make sure there aren't any problems.

20             I'd like to address specifically any concerns

21  the defense has.  The first concern is the taint team

22  won't prevent the taint team, and I think I can address

23  that concern with the understanding that if the wall is

24  breached, the death penalty would be taken off the table.

25  I think that takes care of that concern.

38

1          Mr. Nash or Mr. McNally, I think you would

2    agree with that; right?  It would be hard pressed to say

3    you wouldn't.

4          MR. McNALLY:  Can't complain about that.

5          THE COURT:  Okay.  And then the second concern

6    is the number of government counsel; correct?

7          MR. McNALLY:  Yes, Your Honor.

8          THE COURT:  And do you mean the number of

9    government counsel sitting on that side at trial?

10         MR. McNALLY:  No.  I mean the -- the army of

11   prosecutors, whether they're at the table or working on

12   motions during trial, they're part of the effort, and

13   it's one sided.  And it's not a level playing field.

14         THE COURT:  They're always going to have an

15   army.

16         Let me ask you this.  I mean, it's just the

17   reality; right?  Is it ever a level playing field?  I

18   mean, just to be fair, I mean, I know we say as Courts,

19   look, this is fair.  Yeah, it's fair, but it's never

20   level.  I mean, any Court that says that is putting

21   blinders on.  I mean, the government is always -- they've

22   got essentially unlimited resources because they can take

23   our money and hire another attorney and sit them there.

24   Right?

25         MR. McNALLY:  Yes, Your Honor.

1            THE COURT:  Okay.  Let me ask you this just

2  to -- and I don't mean to throw you a curve ball.  If we

3  were to set up a taint team, could I -- and I don't know

4  the answer.  You know, Mr. McNally, better than anyone.

5  Could I appoint a third attorney for the defense to deal

6  with the government's taint team?  Does that make sense?

7  In other words, could you and Mr. Nash brainstorm and

8  say, here's a woman or man we would want that, Judge, if

9  you did this, here's an attorney we can kind of turn over

10 this process to so we don't get distracted like they're

11 not getting distracted, and we have someone that can --

12 or maybe bring them in at the liability phase, and you

13 say -- and Mr. Nash says, you know what, Mr. McNally is

14 the expert on the penalty phase.  I'll try and fire off

15 the liability wall and give me the other attorney, and

16 we're going to move Mr. McNally to that phase.

17            I'm not saying you have to.  All I'm saying is

18 could that alleviate some of your concerns?  Because I

19 don't see the concern at trial.  Now, maybe you can lay

20 it out in writing to me in a way that I'm not seeing it.

21 But I actually think it's an advantage for the defense

22 for the government to have more lawyers.

23            In fact, when I was a lawyer as a prosecutor, I

24 always -- I didn't want anyone sitting next to me.  I

25 didn't even -- I liked being over there at this big table

1    all alone so at least I could remove some of that

2    perception from the jury that here's the big bad

3    government.  Here I am with a yellow pad, right, no

4    binder, nothing else, just sitting there by myself.

5    I think that conveys a message that's different than

6    20 attorneys sitting over there.

7               MR. McNALLY:  That wasn't a curve ball.  That

8    was a knuckle ball, and I'm not used to judges being this

9    creative.  I think it's -- I think the Court makes some

10   interesting points.

11              That would -- yeah, I suppose, Judge, that

12   would assuage some of our concern about the firewall.

13              But we still have to object to the whole --

14   to -- to amending 12.2, which says nothing about

15   firewalls and requiring early disclosure on the part of

16   the defense.  It depends on what the schedule is.  So

17   there's a lot of ifs here.  But, yeah, I think that

18   certainly would assuage some concern we have about being

19   outnumbered, vastly outnumbered.

20              THE COURT:  Okay.  But the two -- okay, so

21   there's three concerns you've raised now.  One is more

22   attorneys at trial.  Just so I understand it.  One is the

23   rule doesn't permit it.  Is that fair?  Is that a fair

24   way of me saying it?

25              MR. McNALLY:  Yes, Your Honor.

41

```
 1              THE COURT:  Okay.  And give me the third again.
 2   I went blank.  Oh, the third was the taint, that actually
 3   is tainted, and I've addressed that concern I think.
 4              MR. McNALLY:  Yes.  It's the -- it's the taint
 5   lawyers joining the prosecution team.  It's -- or the
 6   early --
 7              THE COURT:  Prematurely joining the prosecution
 8   team?
 9              MR. McNALLY:  I'm sorry?
10              THE COURT:  Oh, there's both.  Them joining at
11   all and then the premature joining?
12              MR. McNALLY:  Right.
13              THE COURT:  Okay.
14              MR. McNALLY:  And then -- and then the kind of
15   one-way discovery about mental health evidence that is
16   required to be disclosed.
17              THE COURT:  Let me ask you this.  Why couldn't
18   I require reciprocal discovery within the process of
19   that, that if I'm going to require you to disclose your
20   experts after they have their experts, they have to
21   disclose them back to you?
22              MR. HEGYI:  That is what happens, Your Honor.
23              THE COURT:  Okay.
24              MR. HEGYI:  It will be.
25              THE COURT:  So it's not one way?
```

42

```
 1              MR. HEGYI:  It is not one way.

 2              MR. McNALLY:  Well, it's not one way.  It's

 3   just -- it's early disclosure that 12.2 doesn't talk

 4   about.

 5              MR. HEGYI:  Advisory committee notes,

 6   Your Honor, suggest that -- this particular type of

 7   process.  It doesn't foreclose it.  The advisory

 8   committee notes suggest this is just a -- these are

 9   guidelines, and we realize there's going to be some

10   tinkering that needs to be done.  And this is, in fact,

11   what is regularly done by other Courts who have struggled

12   with the same argument.

13              THE COURT:  Okay.

14              MR. McNALLY:  But those are our concerns, yes.

15              THE COURT:  Okay.  Well, then what I want to do

16   is just take the taint team portion of this under

17   advisement.

18              You-all are going to meet and confer about the

19   deadlines.

20              I'm going to deny the motion in limine to the

21   extent it seeks to preclude the Atkins defense.

22              I would like you-all to meet and confer and

23   set, if you can, in that grand scheme of deadlines,

24   whether we can set kind of an Atkins deadline, a final

25   Atkins deadline.
```

43

```
 1              In other words, you-all don't at this time
 2   think you're going to raise it, but if you discover
 3   subsequent evidence, I think it's a fair point, and you
 4   decided to raise it, there has to be some end to the
 5   process.  And so when would that ultimate end be?
 6              And then -- okay.  And then we all agree that
 7   if there is -- if Atkins ultimately is raised, then we
 8   can decide when I should decide it.
 9              Okay.  Anything else?  Did I miss anything?
10              MR. NASH:  The -- we're contemplating, and I
11   think we're all in agreement, that it's a good idea to
12   get together and try to -- the parties try to formulate a
13   proposed schedule as much as we can, and then submit to
14   you what we've agreed on, which will hopefully be
15   everything.
16              THE COURT:  Right.
17              MR. NASH:  And if not, what we disagree on.
18   Can you give us a deadline to make that submission to you
19   so we can --
20              THE COURT:  I sure can.  Let me ask you this.
21   What works?
22              MR. NASH:  May I have a second?
23              THE COURT:  Yeah.
24              MR. McNALLY:  Judge, could I address something
25   else while they're conferring?
```

44

```
 1                THE COURT:  Sure.
 2                MR. McNALLY:  John has very poor eyesight, and
 3   he hasn't had glasses in two months, and we've gone back
 4   and forth trying to get him glasses.  The marshals have
 5   been very cooperative.  They got him an eye exam.  But
 6   we can't get the prescription filled because they need
 7   to measure the distance between his pupils, and there's a
 8   Lens Crafter technician here, and we wonder if they could
 9   do that today.
10                THE COURT:  Did you check with the marshals?
11                U.S. DEPUTY MARSHAL:  I'd be happy to
12   facilitate that, Your Honor.
13                THE COURT:  Great.
14                MR. NASH:  It's just going to be one
15   measurement.
16                THE COURT:  All right.  Thank you very much.
17                Mr. Millner, I should have said good morning.
18   Good morning.
19                DEFENDANT MILLNER:  Good morning.
20                MR. NASH:  Your Honor, could we make that --
21   back to the scheduling.  Could we make that submission to
22   you by on or before May 1st?
23                MR. WEST:  That's fine, Your Honor.
24                THE COURT:  That's fine with me.  Okay.  Great.
25                MR. WEST:  If counsel is available, we'll meet
```

45

1    for just a few moments after this hearing, Judge, if

2    they're both available.

3              MR. NASH:  Yes.

4              THE COURT:  Okay.  That's great.

5              What about -- so the motion to continue you

6    don't have to respond to.  It's denied without prejudice.

7    We'll address it through this filing.

8              The -- the motion in limine is -- as I

9    mentioned, we'll lay it out in the minute entry order.

10             But the only thing I think I'm taking under

11   advisement is the taint team issue.

12             Okay.  My final question, and then I'm fine.

13   I'd like -- what I won't do is set another status

14   conference.  I'll expect you-all to include that in your

15   filing as to when you'd like another one.

16             I'm happy to continue to do this in Lexington.

17   I don't know if you decided on venue.  Have you?  Or I

18   shouldn't call it venue.  But what courthouse, since the

19   venue remains the same technically by law.

20             MR. WEST:  I don't think we've actually

21   discussed it, but the United States's position is

22   Lexington is the best place to both conduct the trial and

23   also for the security of witnesses that are going to come

24   in.  I'm anticipating both the United States and defense

25   counsel will have a number of witnesses who are inmates.

1    Consequently, the transportation from their place of

2    holding is easier here in Lexington.  I imagine some are

3    going to be held at the local penitentiary as opposed to

4    Fayette County jail, sir.

5                THE COURT:  Okay.

6                MR. NASH:  I think the two options that we had

7    previously discussed were Lexington or potentially

8    Covington, which in my mind transportation is probably

9    about the same either place.

10                Bottom line is and one of the things on our

11   check-off list we needed to do is do some demographic

12   research.  And, frankly, we've been so bound up with this

13   budget process that we've not -- that's not something

14   we've done yet.  So we're -- the bottom line is if the

15   Court will allow, we're not quite ready to submit to

16   issues of where it occurs.

17                THE COURT:  Yeah.  I don't need to know until

18   we get to the point where we're talking about the jury

19   questionnaire, but --

20                MR. NASH:  Yes, sir.

21                THE COURT:  -- I just don't want it to linger

22   out there forever and us to lose sight that that's an

23   issue we have to decide.  I don't -- as I mentioned

24   before, I don't have any problem with Lexington or

25   Covington.

47

```
 1              MR. NASH:  It is on our list, Your Honor, and
 2  it's just one of several things that we've not gotten to
 3  yet.
 4              THE COURT:  Okay.  All right.  Anything else?
 5              I -- will you share that with me once you do
 6  the demographic research?  I'd be curious as to what it
 7  comes back.  Because I have my own preconceived notions,
 8  but I'm not sure they're right.  I can think of reasons
 9  from a defense perspective that Covington would be
10  better, and I can think of reasons that Lexington would
11  be better, and I don't know that I'm right as to either
12  of them.
13              MR. NASH:  We would be happy to share it,
14  Your Honor, yes.
15              THE COURT:  Okay.  I think venue-wise -- or at
16  least not venue but courthouse location-wise from a
17  defense perspective, those are -- in Kentucky I would
18  think those are two of the three best.  But that's also
19  speculation on my part.  And the third one is not
20  available to you without a change of venue.
21              MR. NASH:  Yeah, Jefferson County obviously
22  would be a third.  Yeah, I would agree, Your Honor.
23              THE COURT:  What did you say would obviously?
24              MR. NASH:  I would say that Jefferson County --
25              THE COURT:  Right.
```

48

```
 1              MR. NASH:  -- would be the third.

 2              THE COURT:  Okay.  At least I was right about

 3   that, or at least our speculations are the same.

 4              Anything else?

 5              MR. WEST:  No sir.  Thank you.

 6              MR. NASH:  Nothing further.

 7              THE COURT:  Okay.  Thank you-all very much, and

 8   thank you for indulging me on my crazy thoughts.  I'll

 9   continue to, I'm sure, bring them up, and you-all

10   continue to have good reasons to put me back where I

11   belong.

12              So I'll look forward to seeing you-all soon.

13              And I appreciate all the thoughtfulness in the

14   briefing and the good briefing in this case.  It's always

15   nice to get very well thought out briefs.

16              So have a good day, and I'll look forward to

17   the filing May 1st.

18              MR. NASH:  Thank you.

19              THE COURT:  Thank you.

20              And we'll get a written opinion on the taint

21   team issue out at some point.

22              MR. NASH:  Very well.  Thank you.

23              MR. HEGYI:  Thank you, Your Honor.

24              THE COURT:  Thank you.  Some point soon.

25   Hopefully by May 1st.  How about that?
```

49

1          Thank you.

2      (Whereupon, the Status Conference Hearing

3  proceedings concluded at 11:50 a.m.)

4                  C E R T I F I C A T E

5      I, Peggy W. Weber, certify that the foregoing is a

6  correct transcript from the record of proceedings in the

7  above-entitled matter.

8

9

   March 13, 2015                    s/Peggy W. Weber

10     DATE                          PEGGY W. WEBER, RPR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25